COMMONWEALTH *vs.* CHARLES FLYNN.
(and three companion cases [1]).

Essex.   May 2, 1972. — September 13, 1972.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & HENNESSEY, JJ.

*Error,* Whether error shown, Whether error harmful. *Practice, Criminal,* Trial of defendants together; Continuance; Findings by judge; Guarding of defendant in court room; Transcript of testimony before grand jury; Judicial discretion; Examination of exhibits; Mistrial; Voir dire; Exceptions: failure to save exception. *Evidence,* Judicial discretion, Leading question, Corroborative evidence, Accomplice, Prior conviction, On cross-examination, Demonstration, Photograph, Conspiracy, Common criminal enterprise. *Witness,* Competency, Accomplice. *Identification. Robbery. Accessory. Supreme Judicial Court,* Argument. *Words,* "Masked."

A defendant, whose objection to the Commonwealth's request that a prosecutor attend defence counsel's interview with an incarcerated prosecution witness was overruled, failed to sustain his burden of showing prejudicial error where the record was unclear as to whether a prosecutor did attend the interview. [461]

There was no error, as alleged by one defendant, in either granting or refusing a motion to sever the case of a codefendant who pleaded guilty prior to trial. [462]

Defendants' motions to sever, on the ground that they would be deprived of their right of confrontation if inculpatory out-of-court statements by codefendants not testifying were introduced, were properly denied where no such statements were in fact introduced. [462]

A judge did not abuse his discretion by denying motions for severance by three defendants charged with identical crimes arising out of the same chain of events, although their degrees of participation differed at various stages of the alleged crimes. [462–463]

At a hearing on pre-trial motions by two defendants to suppress inculpatory testimony of a codefendant, there was no abuse of discretion in denying a continuance to the defendants in order to obtain a transcript of their interview the preceding day with the codefendant, where the codefendant, a stenographic recording of the interview, and the stenographer were available at the hearing. [463]

Findings of fact at a pre-trial hearing were not reviewable on the ground that they were "against the weight of the evidence." [463]

A motion for a continuance by two defendants, based on the ground that a codefendant had on February 11 pleaded guilty and would

---

[1] The companion cases are against Charles Flynn, Kenneth H. Foster and Carl Valleca.

Commonwealth *v.* Flynn.

testify for the prosecution, was properly denied, where the defendants had been represented by counsel for some time, and where the trial did not begin until February 17 and the codefendant did not testify until March 4.  [464]

A judge did not "unconstitutionally delegate . . . [his] exclusive authority" to decide whether two defendants should be shackled in the court room by consulting a deputy sheriff or court's security officer on the matter.  [464–465]

A judge, who permitted two defendants to examine for two hours a thirty-four page transcript of a codefendant's grand jury testimony, did not err in denying the defendants' requests for copies of that transcript.  [465–466]

There was no error in not allowing defence counsel to have in his possession while cross-examining a prosecution witness a transcript of that witness' grand jury testimony, where the judge did allow counsel to show the witness portions of the transcript pertinent to his trial testimony.  [466]

A defendant who had pleaded guilty but had not been sentenced was competent under G. L. c. 233, § 20, to testify against his codefendants.  [466–467]

It was not error for a judge to permit a prosecutor on direct examination to put leading questions to a prosecution witness.  [467]

A jury may convict a defendant on the uncorroborated testimony of an accomplice.  [467]

A judge did not abuse his discretion, after the reading and admission in evidence of records of prior convictions of a prosecution witness, by refusing to allow the records to circulate among the jurors at that time or by instructing the jury at that time on the limited purpose for which the records were admitted.  [467–468]

There was no error in the clerk's informing certain veniremen of the charges against the defendants in slightly different language from that which he had used the previous day to other veniremen, where he correctly stated the charges to the jury shortly after their empanelment, and the jury had all of the indictments with them when they deliberated.  [469]

Where a count alleging robbery from a certain victim had been nol prossed, there was no error in denying defendants' motions for a mistrial when the prosecutor included the name of that victim in his opening statement.  [469]

A victim of a robbery was a competent witness at the robbers' trial even though the count alleging robbery from him had been nol prossed.  [469–470]

A judge did not abuse his discretion by restricting the scope and extent of cross-examination of a prosecution witness.  [470]

At a trial for robbery of persons at a gambling game, an unresponsive reference by a prosecution witness to "other robberies" was not prejudicial, where the remark was struck and the jury instructed to disregard it, and it did not link the defendants with "other robberies."  [470–471]

Defendants in a robbery case were not entitled to a voir dire hearing on whether a prosecution witness would be permitted to make an in-court identification of another eyewitness.  [471–472]

At a trial of defendants charged with committing robbery with lady's stockings over their heads, the judge's refusal to permit defence

attorneys to demonstrate in the court room the facial distortions caused by a stocking was within his sound discretion. [472–473]

A photograph of a defendant, taken almost a year before the robbery with which he was charged, was admissible where there was testimony that it was a fair representation of his appearance on the date of the robbery. [474]

In a robbery case, there was no error in admitting in evidence a large noninflammatory photograph which fairly represented a defendant at the time of the robbery, even though a small photograph of him had already been admitted, where he had lost considerable weight since the date of the robbery. [474–475]

Where it did not appear that any juror had seen words on the back of a photographic exhibit indicating that a defendant was a dangerous criminal, and where the court ordered that the exhibit not go to the jury room during deliberations, the defendant was not prejudiced. [475]

A judge, who found sufficient evidence to support an inference of a common enterprise among defendants charged with robbery, did not err in permitting evidence admitted against one defendant to be admitted against all, even though the defendants were not charged with conspiracy. [476–477]

General Laws c. 265, § 17, which increases the punishment for armed robbery if the robber is masked, does not require that the mask so totally conceal the robber's face that he cannot be identified. [477–478]

Evidence against a defendant convicted of armed robbery, considered in its aspect most favorable to the Commonwealth, was sufficient to warrant a verdict of guilty even though he did not enter the place where the robbery occurred. [478–479]

Where evidence was sufficient to warrant a jury in finding a defendant guilty of being an accessory before the fact, the jury could under G. L. c. 274, § 2, find him guilty as a principal. [479]

Assignments of error incorporated by their numerical designation into the headings of a brief but not argued are deemed waived under S.J.C. Rule 1:13. [480]

TWENTY-FIVE INDICTMENTS found and returned in the Superior Court, twenty-three on September 10, 1969, and two on September 18, 1969.

Pre-trial motions were heard by *Bennett, J.,* and the cases were tried before him.

*Joel R. Labell,* for Carl Valleca (*Eli G. Mavros,* for Kenneth Foster, with him).

*Peter F. Brady,* Assistant District Attorney (*Michael T. Stella, Jr.,* with him) for the Commonwealth.

*Harvey Brower,* for Charles Flynn, submitted a brief.

QUIRICO, J. Charles Flynn, Demosthenes Gatzimas, Morris M. Capriole, Kenneth H. Foster and Carl Valleca

were each charged in various indictments or counts thereof with the following crimes allegedly committed on May 5, 1969: (a) breaking and entering in the night-time a building in Lawrence, with intent therein to commit a felony, to wit: armed robbery while masked or disguised, and (b) armed robbery while masked from each of twenty-four different persons then in the building.

On February 11, 1970, Gatzimas pleaded guilty to all of the charges against him. On February 17, 1970, Flynn, Foster and Valleca went to trial together under G. L. c. 278, §§ 33A–33G, on all of the charges against them. On March 11, 1970, they were found guilty on all such charges with the exceptions noted in the margin.[2] The cases are before us on their separate appeals and assignments of error.

The principal witnesses for the Commonwealth at the trial were the victims of the robbery and Gatzimas who had pleaded guilty but who was not sentenced until after the trial was over. We summarize the evidence in a manner sufficient for our decisions of the issues argued.

Prior to May 5, 1969, the date of the alleged crimes, Gatzimas had known Flynn for about four to four and one-half years, Foster for a period not appearing in the record, and Valleca for six or eight months. On Wednesday, April 30, 1969, Foster, driving a 1967 Cadillac automobile, took Flynn and Gatzimas from Flynn's house in Tewksbury to Valleca's apartment in Methuen. There a conversation took place in which Valleca said he had not been able to obtain two guns for Flynn, that he had obtained only one, and that Flynn should go to a named place in Lawrence to see one "Moe," later identified as Capriole, about getting another gun. Foster drove Flynn and Gatzimas to the named place where Flynn spoke to Capriole and the latter gave Flynn an

---

[2] On February 18 and February 27, 1970, two counts against Foster and Valleca charging armed robbery were nol prossed. On February 18, 1970, Capriole pleaded guilty to two counts charging him with armed robbery, and on February 23, 1970, twenty-two additional charges of armed robbery and a charge of breaking and entering against him were nol prossed.

automatic pistol. The next evening Gatzimas, Flynn and Foster were together at Flynn's house, and drove to the place in Lawrence where Flynn had seen Capriole the day before. The record does not disclose the purpose of this trip.

On the evening of Friday, May 2, 1969, using the same Cadillac automobile, Flynn, Foster and Gatzimas again drove from Flynn's house to Lawrence where Flynn wanted to see Capriole about getting another gun. Capriole joined them and they drove to a variety store where Capriole purchased two pairs of ladies' silk stockings. When Flynn saw the stockings he objected that they were too small but Capriole said that they were "about the largest size he could have gotten." On that same evening Flynn and Gatzimas met Valleca in Lawrence and Valleca gave them a description of the layout of the Syrian club in that city.

On Saturday, May 3, 1969, Foster drove Gatzimas to Flynn's house, arriving there about 12:30 P.M. Flynn asked Gatzimas to drive to Valleca's house to pick up a key to the Syrian club. Gatzimas did so, and Valleca gave him the key telling him to go straight to Flynn's house without stopping and to give the key to him.

About 11:30 P.M. on Sunday, May 4, 1969, Foster, using the same Cadillac automobile, drove Gatzimas and Flynn from the latter's house to the Syrian club in Lawrence, and let them off there about midnight. Gatzimas and Flynn went to the side of the club building where each put a silk stocking over his face. Each had a firearm on him. Flynn opened the door of the club with a key and they both entered the building. They went down a stairway to a lower level of the club where there were twenty-five or thirty men, most of them engaged in some form of gambling. Flynn fired one shot, and announced, "All right, everybody line up against the wall. This is a holdup." He ordered all the men to remove their trousers and they did so. Gatzimas gathered the trousers and put them in a pillowcase given to him by Flynn. Flynn searched several pairs of trousers, removed the

wallets, and threw the trousers on the floor. The stockings worn by Gatzimas and Flynn did not fully hide their facial features, and one or more of the robbery victims who knew them recognized them and identified them in their later court testimony. Gatzimas knew at least one of the robbery victims.

Flynn and Gatzimas then left the building and went to the car in which Foster was waiting, about forty yards away. The car's motor was running, and Foster drove them back to Flynn's house. There the three men removed the contents from the trousers and counted the money which amounted to about $2,400. From this, Flynn gave $400 to Foster, $830 to Gatzimas, a total of $400 to three other persons present, and he put the rest of the money in his pocket. The stockings used as masks during the robbery and the trousers, credit cards, licenses and similar items taken from the victims were put back in the pillowcase. Gatzimas, Foster and two men other than Flynn drove to the bridge over the river in Tyngsborough and threw the pillowcase and its contents into the water below. The two guns used in the robbery were left at Flynn's house.

There was the following additional evidence limited to Valleca. On Tuesday, May 6, 1969, Valleca called Gatzimas and said that he wanted "some money so that he could give it to the fellow that he got the key from." He said he wanted $125. There was further conversation which resulted in Gatzimas meeting Valleca in Lowell where he gave him $70.

During this eighteen day trial the three defendants claimed a total of 734 exceptions to the judge's rulings and instructions to the jury. Not all of the exceptions were made the subject of assignments of alleged errors; and not all alleged errors assigned were ultimately argued in the defendants' briefs. The questions argued fall into thirteen principal categories, all but one of which were argued by two or more of the defendants. Because of this pattern of issues argued, we shall consider each issue separately, rather than the claims of each defend-

ant separately. As we enter on the discussion of each issue, the number of the issue will be followed by the names of the defendants who raised it.

1. (Valleca). On February 11, 1970, Gatzimas pleaded guilty to all charges against him, and the Commonwealth disclosed that he would be a witness against the other defendants. The defendants asked the court for permission to interview Gatzimas. The Commonwealth did not object but asked that some one from the district attorney's office be allowed to attend the interview. Valleca's objection to the Commonwealth's request was overruled and he excepted. The defendants were entitled "as of right [to] an opportunity to interview prospective witnesses held in the custody of the Commonwealth." *Commonwealth* v. *Balliro*, 349 Mass. 505, 516–517. This included Gatzimas who was in custody pending disposition on his pleas of guilty. In *Commonwealth* v. *Doherty*, 353 Mass. 197, 211, cert. den. sub nom. *Doherty* v. *Massachusetts*, 390 U. S. 982, we said further that if such a witness "elected to be interviewed, we think the defendants' counsel were entitled to talk with the witness, each separately and without the presence of the prosecutor or police officers." See *Commonwealth* v. *Carita*, 356 Mass. 132, 142–143.

The interview of Gatzimas by Valleca's counsel was held February 12, 1970, and lasted about one and one-half hours. The record does not disclose what Gatzimas said in the interview, but Valleca's brief says that "Gatzimas volunteered useful information." The record does not tell us whether any person from the district attorney's office attended the interview. The Commonwealth's brief attempts to tell us no one did, and counsel for Valleca attempted to tell us in oral argument that someone did. The record leaves much to be desired on this issue. The burden is on the excepting defendant to present to us a record which shows error and prejudice resulting therefrom. Valleca has failed to satisfy this requirement on this issue.

2. (Foster and Valleca). Foster and Valleca allege

error in the denial of their motions to sever their cases for trial. Both defendants assert, without elaboration in argument, that they were somehow denied their rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Valleca alleges error by the judge in "disallowing Gatzimas' Motion to Sever his case from all other of the co-defendants . . . and by disallowing" Valleca's similar motion. In his brief he argues he was denied equal protection of law by "the trial Court's allowance of Gatzimas' Motion to Sever." Whichever version Valleca intended, there is no merit to his argument. Gatzimas pleaded guilty before his trial started, and there was no further severance question as to him thereafter.

Both Valleca and Foster argue that they were entitled to severances under the rule of *Bruton* v. *United States,* 391 U. S. 123, which held that where two defendants were tried together, the admission of a statement made after the alleged offence and out-of-court by a defendant who did not testify at the trial and which inculpated the other defendant violated the latter's rights under the confrontation clause of the Sixth Amendment to the United States Constitution. There were no such statements offered or admitted here, and therefore the rule of the *Bruton* case does not apply. *Commonwealth* v. *Whooley, ante,* 313–317. Their further argument that in some manner not fully developed or explained, the rule of the *Bruton* case should be applied in a manner to prevent Gatzimas from inculpating his codefendants by his testimony as a witness at their trial is without merit. See *Dutton* v. *Evans,* 400 U. S. 74.

The question of severance of the trials of Flynn, Foster and Valleca was a matter for decision by the judge in the exercise of his discretion. These three defendants were charged with identical crimes arising out of the same chain of events, although their degree of participation differed at various stages of the alleged crimes. Clearly, the judge did not abuse his discretion in denying

any motion for the severance of their trials. *Common-
wealth* v. *Iannello*, 344 Mass. 723, 727.

3. (Foster and Valleca). Foster and Valleca allege
error in the judge's denial of their pre-trial motions to
suppress testimony of Gatzimas identifying them and de-
scribing their parts in the crimes. The claims of error
rest on two arguments. The first is that the judge im-
properly required them to proceed with the hearing on
the motions without a transcript of their interview with
Gatzimas. The interview was held in the late afternoon
of February 12, 1970, and was recorded on a stenotype
machine. The judge had allowed a recess in the hearing
on the motions to permit counsel to conduct the interview,
and he required the parties to continue with the hearing
on the morning of February 13, 1970. At that time the
stenographer was present with his stenotype recording
of the interview and Gatzimas was present and available
for use by the defendants as a witness at the hearing.
The stenographer had not been requested by the defend-
ants to prepare a transcript of the interview. Whether
the judge should grant the defendants a continuance in
the hearing which was then in progress was a matter
resting in his sound discretion. His denial of the con-
tinuance in the circumstances of this case was not an
abuse of discretion.

After hearing, the judge denied the motions to sup-
press, and in so doing he found against the defendants on
substantially all factual issues raised by their motions.
By identical language in their separate briefs, Foster and
Valleca contend that the findings were "against the
weight of the evidence" presented at the hearing. The
weight of the evidence, and particularly evidence con-
sisting of oral testimony, is to be determined by the trial
judge, and there is nothing in the records of these cases
to make it reviewable by this court, assuming it is re-
viewable under any circumstances. There was no error
in the denial of the motions to suppress.[3]

_____

[3] Although we have proceeded on the assumption that both Foster
and Valleca made motions to suppress, we note that neither the

4. (Foster and Valleca). On February 13, 1970, the Commonwealth moved for trial of the indictments against Flynn, Foster and Valleca. Foster and Valleca orally moved for a continuance on the principal ground that they needed more time to prepare for trial because of the fact that Gatzimas, a codefendant, had pleaded guilty on February 11, 1970, and would be a witness for the Commonwealth. Counsel for Valleca had been representing him since arraignment on October 2, 1969. Mr. Harvey Brower of the firm of Mavros, Fitzgerald and Brower, had represented Flynn since October 10, 1969, and on January 22, 1970, he was appointed to represent Foster, succeeding earlier counsel. On February 11, 1970, Mr. Brower withdrew his appearance for Foster and on the same date Mr. Eli G. Mavros of the same law firm was appointed to represent him. The trial began with the selection of a jury on February 17, 1970. Gatzimas was not called as a witness until March 4, 1970.

In *Commonwealth* v. *Smith*, 353 Mass. 442, 445, we said, "The defendant was entitled to reasonable opportunity to obtain counsel and to prepare a defence." We then quoted with approval the following language from *Ungar* v. *Sarafite*, 376 U. S. 575, 589: "The matter of continuance is traditionally within the discretion of the trial judge . . . . There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Applying that rule to the facts of these cases, we hold that the judge's denial of the requests for a continuance of trial did not constitute an abuse of his judicial discretion.

5. (Flynn and Valleca). When Flynn and Valleca were first brought in the court room for trial they were shackled. Their counsel moved that they be unshackled.

---

printed records nor the dockets warrant this assumption as to Foster. Perhaps he made such a motion orally, but if he did, nothing in his brief has enabled this court to discover it in the transcript.

The judge stated that whether the requests should be granted was a matter of discretion, citing *Commonwealth* v. *Dirring*, 354 Mass. 523, 528. The judge then asked a deputy sheriff or court officer in charge of security in the court room for his opinion on the matter. After receiving that opinion the judge denied the motions. Counsel for Flynn and Valleca argue that the judge thus "unconstitutionally delegated . . . [his] exclusive authority" in the matter to the court officer. This is an unwarranted reading of what the judge did. His decision was a proper application of the rule which we stated as follows in *Commonwealth* v. *Agiasottelis*, 336 Mass. 12, 16: "It is, of course, desirable, whenever possible, to avoid shackling a prisoner during his trial. . . . However, a judge properly should be reluctant to interfere with reasonable precautions which a sheriff deems necessary to keep secure prisoners for whose custody he is responsible and, if a judge fails to require removal of shackles, his exercise of a sound discretion will be sustained." *Commonwealth* v. *Millen*, 289 Mass. 441, 477–478, cert. den. sub nom. *Millen* v. *Massachusetts*, 295 U.S. 765. *Commonwealth* v. *Ladetto*, 353 Mass. 746. *Commonwealth* v. *Connearney*, 359 Mass. 200, 204. The fact that Foster who was at liberty on bail was not shackled, and that Gatzimas who had pleaded guilty might or might not appear as a witness in shackles, did not alter the situation. Gatzimas was in fact handcuffed when he testified.

6. (Foster and Valleca). The judge allowed the defendants' motions that they be permitted to see a thirty-four page transcript of the testimony given by Gatzimas before the grand jury. Their counsel read this transcript on February 17, 1970, and had it for this purpose for about two hours. Foster and Valleca allege that it was error for the trial judge to deny their requests that they each be furnished a copy for their own use. Even under our most recent decision in *Commonwealth* v. *De Christoforo*, 360 Mass. 531, 533–536, the defendants are not entitled, as of right, to individual copies of grand

jury minutes. There was no error in the denial of the requests for individual copies.

Valleca alleges error based on the fact that while cross-examining Gatzimas, his counsel was not allowed to have the transcript in his own possession. The transcript was in the possession of the prosecutor, and on the several occasions when counsel for Valleca claimed that the testimony by Gatzimas was contrary to or inconsistent with what he had said before the grand jury, the judge examined the transcript, and then permitted counsel to show the pertinent portions to the witness. Valleca contends this constituted an abuse of discretion by the judge. We disagree. It appears from the record that he was permitted to make such use of the transcript as was reasonably necessary for the proper cross-examination of Gatzimas.

7. (Flynn, Foster and Valleca). Each defendant has devoted a portion of his brief to a blanket type of criticism of the judge's many rulings in relation to Gatzimas and his testimony. These portions of the briefs do not attempt to cover specific assignments of error or exceptions, but rather attempt to delegate to the court the task of seeking out the exceptions to which the arguments may apply. This we shall not do, but we shall consider several common arguments made in these parts of the briefs.

a. The defendants contend that Gatzimas should have been disqualified as a witness because he had pleaded guilty and had not been sentenced when he testified. They cite no judicial authority for such an argument, but suggest that because he was a confessed accomplice in the crimes charged he would be untrustworthy or unreliable as a witness. This same argument was rejected by this court in Commonwealth v. Domanski, 332 Mass. 66, 74–75, where we said that the common law disqualification of an indictee to testify against a coindictee had been removed by G. L. (Ter. Ed.) c. 233, § 20, and that "whatever the rule was at common law, an indictee not

on trial is now competent to testify against his coindictee."

b. The defendants argue that it was error for the judge to allow the prosecutor to put leading questions to Gatzimas in direct examination. We have held in many opinions that the decision whether to allow leading questions "should be left for the most part to the wisdom and discretion of the trial judge instead of being restricted by the mechanical operation of inflexible rules." *Guiffre* v. *Carapezza,* 298 Mass. 458, 460. *Commonwealth* v. *Sheppard,* 313 Mass. 590, 597, cert. den. sub nom. *Sheppard* v. *Massachusetts,* 320 U. S. 213. In both cited cases we said, on the pages indicated: "We are aware of no decision in this Commonwealth in which exceptions have been sustained because of the allowance of leading questions." That statement is probably still true as of this date. *Commonwealth* v. *Johnson,* 352 Mass. 311, 319–320, app. dism. sub nom. *Johnson* v. *Massachusetts,* 390 U. S. 511. In our recent decision in *Commonwealth* v. *Therrien,* 359 Mass. 500, 508, we disposed of exceptions to leading questions by the following statement: "The objections concerning leading questions do not merit individual discussion," and cited the *Guiffre* case, *supra.* There was no error as to leading questions.

c. The defendants make frequent references in their briefs to the fact that in some vital aspects of the case the testimony of Gatzimas stood alone without corroboration. "[T]here is, in this Commonwealth, no rule of law that a jury cannot convict upon the uncorroborated testimony of an accomplice." *Commonwealth* v. *Lammi,* 310 Mass. 159, 165. *Commonwealth* v. *Taber,* 350 Mass. 186, 187. "A trial judge may tell the jury to scrutinize the testimony of an accomplice with care, especially when the testimony is not corroborated. . . . He is not required to do so." *Commonwealth* v. *French,* 357 Mass. 356, 396, judgment vacated as to death penalty, sub nom. *Limone* v. *Massachusetts,* 408 U. S. 936.

d. During their cross-examination of Gatzimas the

defendants offered certified copies of eight records of his convictions for crimes, and each record was marked as an exhibit. Substantially everything contained in each record was stated in open court in the hearing of the jury as part of a question whether the witness was the person named in the records. After the records were marked as exhibits, counsel asked permission to circulate them among the jurors and the request was denied. The judge correctly explained to the jury the purpose for which such records were admitted, viz. on the question of the credibility of the witness. G. L. c. 233, § 21, as amended by St. 1950, c. 426. The defendants excepted. There was no error. It was discretionary with the judge to permit the exhibits to be shown to the jury when they were introduced, or to defer the viewing of them by the jury until they retired to deliberate. He chose the latter course. The defendants were not harmed by the delay since all of these exhibits had in effect been read aloud as parts of questions. The decision when to instruct the jury on the limited purpose for which the records were admitted was discretionary with the judge. In neither of his two decisions did he abuse his discretion.

8. (Flynn, Foster and Valleca). Flynn and Valleca each claimed by identical language in this brief that "[t]he Court erred in many instances of procedural rulings against [the] defendant's Motion for Mistrial," and also that there were "numerous instances of seemingly 'harmless' unresponsive conduct, misconduct and mal-conduct by the Commonwealth's witnesses, and indeed the Commonwealth . . . [which] produced an overall prejudicially subtle setting within which the defendant was tried." Foster devotes only nine lines of his brief to the statement and purported argument of these same alleged errors. Such treatment by Foster falls far short of constituting an argument meeting the requirements of S. J. C. Rule 1:13, 351 Mass. 738. However, since we must treat with these alleged errors as argued in the briefs of Flynn and Valleca, our holdings thereon will apply equally to Foster.

a. On February 17, 1970, certain veniremen who were in the court room for the empanelling of a jury were told by the clerk that the charges against the defendants were that "being armed with a dangerous weapon, [they] did assault . . . [named victims] with intent to rob . . . [them]." On February 18, 1970, additional veniremen were told in court that the defendants "being armed with a dangerous weapon, to wit, a gun, did assault . . . [named victims] with intent to rob . . . [them] and thereby while masked did rob and steal from" them certain money. The defendants moved for a mistrial because of this difference in the statements to the jurors. Very shortly after the empanelling of the jury was completed, the clerk correctly read or stated to the jury the nature of the crimes charged against the defendants in each indictment and count thereof. The accuracy of the reading or statement was not questioned by the defendants. When the jury retired to deliberate, they took all of the indictments with them to the jury room. There was no error.

b. Count 20 of indictment 65042 charged Capriole, Foster and Valleca with the crime of armed robbery, while masked, from one "Antoun Nacheli." During the empanelling of the jury the Commonwealth moved to amend the name of the victim to "Antoun Nachef." The defendants objected to the motion with the result that it was withdrawn. The Commonwealth then nol prossed the count over the defendants' objections. In his opening statement to the jury the assistant district attorney included the name of Nachef in naming the twenty-four victims of the robbery. The defendants objected to the reference to Nachef and moved for a mistrial which was denied. When Nachef was called to testify as a witness for the Commonwealth, the defendants moved that he be disqualified as a witness because the count alleging robbery from him had been nol prossed. The motions were denied. There was no error.

Nachef's competence as a witness did not depend upon whether the trial included an indictment or a count

naming him as one of the victims of the robbery. He was present at the time and place of the robbery and he was properly allowed to testify as to what occurred. He was no less competent and qualified to testify after the count naming him as a victim was nol prossed. The fact that according to his description of the events he, too, lost his trousers and some money would not disqualify him as a witness.

The defendants also contend that the judge unduly restricted the scope and extent of their cross-examination of the witness Nachef. The scope and extent of cross-examination of witnesses rests in large part on the discretion of the trial judge. We have examined the several transcript pages cited by the defendants in their briefs on this point and they reveal no abuse of discretion by the judge. *Jennings* v. *Rooney*, 183 Mass. 577, 579, and cases cited. *Commonwealth* v. *Granito*, 326 Mass. 494, 496, and cases cited. *Commonwealth* v. *Aronson*, 330 Mass. 453, 458–459. *Commonwealth* v. *Underwood*, 358 Mass. 506, 512–513, and cases cited.

Finally, the defendants' arguments that it was error to permit the prosecutor to put leading questions to the witness Nachef are governed by what we have said above in disposing of the same argument with reference to the witness Gatzimas.

c. A Commonwealth witness, Raymond Aberizk, one of the victims of the robbery, was asked what he did when he first realized a robbery was taking place. He answered in part: "I took what money I had on my person and stuffed it under the rug, hoping, realizing that other robberies had taken place." Counsel for Flynn objected and the judge said: "No. The last part goes out." The three defendants moved for a mistrial which was denied. At that point the judge instructed the jury to disregard the reference made by the witness to "other robberies." The reference by the witness to "other robberies" was not responsive, and the judge promptly struck it from the record and instructed the jury accordingly. In any event, it did not link the defendants

with "other robberies." The judge did not abuse his discretion in denying a mistrial. *Curley* v. *Boston Herald-Traveler Corp.* 314 Mass. 31, 31–32, and cases cited. *Commonwealth* v. *Bellino*, 320 Mass. 635, 644, and cases cited, cert. den. sub nom. *Bellino* v. *Massachusetts*, 330 U. S. 832. *Commonwealth* v. *Early*, 349 Mass. 636, 637. See *Commonwealth* v. *Barker*, 311 Mass. 82, 87–88; *Killilea* v. *United States*, 287 F. 2d 212, 215 (1st Cir.), cert. den. 366 U. S. 969.

9. (Foster and Valleca). When the Commonwealth called Joseph Saba, one of the victims of the robbery, as a witness, the three defendants made oral motions for a voir dire hearing on the stated ground that such a hearing was required by the decision in *United States* v. *Wade*, 388 U. S. 218. In a bench conference the assistant district attorney stated that Saba, in his testimony, would identify Gatzimas as one of the robbers, but that he would not identify the three defendants. On the basis of that representation, the judge denied the motions. All three defendants excepted and included the ruling in their assignments of error, but only Foster and Valleca have argued the issue in their briefs. Flynn is deemed to have waived his exception thereon.

a. In his brief Foster expressly bases his claim of error on the denial of a voir dire hearing on the rule stated in the *Wade* decision, and he cites no other authority in support of his argument. Neither the *Wade* case, nor its companion cases, *Gilbert* v. *California*, 388 U. S. 263, and *Stovall* v. *Denno*, 388 U. S. 293, require that a voir dire hearing must be held before any witness is permitted to make an in-court identification of another witness at the same trial. They require such a hearing only as to an in-court identification of a defendant by a witness, and then only when the defendant claims that the identification by the witness is tainted by reason of some alleged prior illegal lineup, showup or other confrontation. We know of no case, and none has been called to our attention, in which that rule has been extended to an in-court identification of a person who is not on trial.

The competence of Gatzimas as a witness is based on his own testimony that he was present at the time and place of the robberies charged, and its admissibility does not turn or depend on whether or not the witness Saba identified him as one of the robbers. The judge's denial of a voir dire hearing was not error.

b. In his brief Valleca seems to have abandoned any reliance on the *Wade* case as entitling him to a voir dire hearing, and the only case now cited by him on this issue is *Bruton* v. *United States*, 391 U. S. 123. He is not permitted to raise an issue before the trial court on a specific ground, and then to present that issue to this court on a different ground. For reasons stated in an earlier part of this opinion, the *Bruton* case does not apply to these cases. It is unnecessary to discuss it further.

c. Valleca and Foster claim error in the judge's rulings on leading questions in the direct examination of Saba and on the scope and extent of cross-examination of Saba. What we have said above on similar alleged errors with reference to the witnesses Gatzimas and Nachef applies equally here.

10. (Flynn, Foster and Valleca). Of the very large number of exceptions saved by the defendants to rulings by the judge on the admissibility of evidence, only a small portion were covered by assignments of error, and very few of them were separately argued in their briefs. In our view only two of those argued require separate consideration.

a. During his cross-examination of the witness Saba, counsel for Flynn showed him a lady's stocking which Saba testified looked similar to the stockings which the robbers wore at the Syrian club on the night in question. It was marked as "Exhibit A" for identification only. It was never identified as a stocking worn by one of the robbers, and was never admitted in evidence. While cross-examining Saba, counsel for Valleca stated that he was going to put the stocking (exhibit A) on his (counsel's) head, whereupon the judge told him he could not do so, and that "No one is going to put it on." The judge

had previously told counsel for Flynn that he would allow no demonstrations of what the stocking (exhibit A) would do to a person's features, and he later similarly restricted counsel for Foster. Several days later in the trial, counsel for Valleca repeated his request for permission to put the stocking (exhibit A) over the face of some other person. The judge again refused, stating that he found "that circumstances in this Court are not sufficiently similar to those at the time and place of the robbery to make the demonstration . . . sufficiently fair and informative for the jury. And in my discretion I deny your request to put the mask on in front of me." The defendants allege all of these refusals of the judge are error. We do not agree.

We have held on numerous occasions that "[t]he permission to perform or make experiments or illustrations in the presence of the jury rested in the sound judicial discretion of the trial judge." *Commonwealth* v. *Chin Kee,* 283 Mass. 248, 260, and cases cited.[4] We have also held on numerous occasions that "[w]hether the conditions were sufficiently similar to make the . . . [experiment or demonstration] of any value in aiding the jury to pass upon the issue submitted to them was primarily for the trial judge to determine as a matter of discretion. His decision in this respect will not be interfered with unless plainly wrong." *Field* v. *Gowdy,* 199 Mass. 568, 574. *Commonwealth* v. *Tucker,* 189 Mass. 457, 478. *Posell* v. *Herscovitz,* 237 Mass. 513, 517. *Guinan* v. *Famous Players-Lasky Corp.* 267 Mass. 501, 521–522. *Jordan* v. *Velozo,* 269 Mass. 347, 351. *Commonwealth* v. *Chin Kee, supra.*

b. The witness Nachef testified that Flynn's appearance on the date of the robbery was different from what it was on the date of the trial in that Flynn had lost much weight between the two dates. He identified a small photograph as a fair representation of Flynn on

---

[4] For further proceedings in the cited case see *Chin Kee* v. *Commonwealth,* 354 Mass. 156; S. C. 407 F. 2d, 10 (1st Cir.), cert. den. sub nom. *Chin Kee* v. *Massachusetts,* 395 U. S. 982.

the date of the robbery. Flynn's counsel questioned the use of this small photograph because it appeared to show a chain around the neck. The assistant district attorney then produced another print of the small photograph and after examining it counsel for Flynn said: "This is the same picture as that picture without the chain." The latter photograph was then offered in evidence, marked exhibit 1, and shown to the jurors, without objection or exception by the defendants. Statements to the contrary in Flynn's brief are incorrect. He had objected to a larger "blow-up" originally offered but withdrawn, but not to the small photograph ultimately marked exhibit 1. An assignment of error not based on an exception brings nothing to this court for review. *Commonwealth* v. *Gray,* 314 Mass. 96, 102. *Commonwealth* v. *Chapman,* 345 Mass. 251, 255–256. *Commonwealth* v. *Underwood,* 358 Mass. 506, 509–510, and cases cited.

Seven days after the small photograph of Flynn was admitted and marked exhibit 1, the defendants moved to strike it because (a) in the interim the person who took the photograph testified that he did so in June, 1968, and (b) it was therefore "too remote to the incident [the robbery of May 5, 1969], to have any bearing on the case." The motion was denied and all defendants saved exceptions. There was no error. Before the exhibit 1 was admitted there was testimony that it was a fair representation of Flynn as he looked on the date of the robbery, and it was thus admissible. The difference in dates was a matter which the jury might consider in deciding what weight to give to the testimony and the photograph, but it did not require the striking of the photograph.

Two days after the two inch photograph had been marked as exhibit 1, the assistant district attorney produced a glossy photograph of Flynn, eight inches by ten inches in size, which the witness Gatzimas identified as a fair representation of Flynn on the date of the robbery. The judge found as a preliminary fact that the photograph, which was not the same one earlier offered and then withdrawn, did not appear to be distorted. *Com-*

*monwealth* v. *Noxon,* 319 Mass. 495, 537. He then admitted it as exhibit 2 over the objections and exceptions of the three defendants. The defendants objected on the principal ground that since Flynn had already been identified and described in testimony at the trial the larger photograph either served "no useful purpose" or was "a highly inflammatory tactic." There was nothing inflammatory about the photograph, and in view of Flynn's considerable weight loss between the date of the robbery and the trial, it served a useful purpose. There was no error in admitting it. The fact that Flynn had already been identified by the testimony of a witness as one of the robbers did not preclude further evidence by way of his photograph. *Commonwealth* v. *Locke,* 338 Mass. 682, 687.

Just before the judge started his charge to the jury, he called the attention of counsel to the fact that the following words and portions of words appeared on the back of the two inch photograph marked exhibit 1, which apparently had been cut down from a larger size:

*"Color White*
*Birthplace*
*Occupation*
*Date of Arrest*
*Remarks Is considered*
*rous and will be Armed*
*Use caution if apprehe"*

Counsel for Flynn and Valleca said they had not previously seen the language on the back of the exhibit. They had the opportunity to see and examine it and to take steps necessary to protect their clients' interests when it was offered, but they made no objection to it. *Salter* v. *Leventhal,* 337 Mass. 679, 692–693. The judge ordered that the exhibit not go to the jury room during deliberations. There is nothing in the records or transcript to indicate that any juror saw the language in question. The defendants made no requests for inquiry of the jurors on the matter, made no objections and saved no exceptions based on the language appearing on the back of the exhibit. *Commonwealth* v. *Johnson,* 199 Mass. 55, 62.

the exhibit. *Commonwealth* v. *Johnson,* 199 Mass. 55, 62.

Despite these records which contain no objections, exceptions or indications of prejudice on this matter, Flynn and Foster devote parts of their briefs to arguing claims of prejudice as though the jurors had actually seen the words on the back of the photograph. Flynn's brief includes the extraordinary statement that the words "Wanted for Kidnapping" appear on the back of exhibit 1. Those words do not appear on the exhibit as furnished to this court. Briefs cannot serve the purpose of placing before this court facts indicating prejudice if the facts do not appear in the records and transcript before us. *Gorey* v. *Guarente,* 303 Mass. 569, 570–571. *Coonce* v. *Coonce,* 356 Mass. 690, 692–693. *Crall* v. *Leominster, ante,* 95, 105–106.

c. Valleca contends that the judge was in error when he stated, during the testimony of Gatzimas: "After considering in the first instance as against each defendant separately evidence of such acts, knowledge, and admissions as affect that particular defendant, the Court finds as a preliminary question of fact that sufficient evidence has been presented to support a fair inference of the existence of a common enterprise of the defendants and Mr. Gatzimas, namely, the offenses charged in the indictments." The judge's preliminary finding of a common enterprise was supported by the evidence which had then been introduced, and no useful purpose would be served in reviewing that evidence.

After making that finding the judge told the jury that with one exception any testimony by Gatzimas which had been limited to the particular defendant about whom he was testifying at the time was now being admitted as to all three defendants. The sole exception was Gatzimas's testimony about his conversations and dealings with Valleca several days after the robbery, and that continued to be limited to the defendant Valleca. There was no error either in the preliminary finding or in the removal of limitations on the evidence. The case was apparently tried "in the manner in which conspiracy cases are customarily tried, by allowing in the first instance as against

each defendant separately evidence of such acts, knowledge and admissions as appear to affect the particular defendant and then, when sufficient evidence has accumulated to support a fair inference of the existence of a conspiracy, by removing the limitation, so that evidence of the acts, knowledge and admissions of all who are found to have joined in the conspiracy, during the course of and in pursuance of the conspiracy, becomes applicable against all the conspirators." *Commonwealth* v. *Benesch,* 290 Mass. 125, 132–133, and cases cited. *Commonwealth* v. *Stasiun,* 349 Mass. 38, 50–51, and cases cited. *Commonwealth* v. *French,* 357 Mass. 356, 379, judgment vacated as to death penalty sub nom. *Limone* v. *Massachusetts,* 408 U. S. 936. *Commonwealth* v. *Kelley,* 359 Mass. 77, 85–86, and cases cited. Although the language quoted above, and the citations which follow, all relate to cases in which there was a formal charge of conspiracy, the same general rule of evidence applies to cases where a conspiracy or common enterprise is shown to exist even though not charged. "A common design or enterprise between the defendants being first proved, it was clearly competent to admit the declarations of one of them, in relation to the joint undertaking, to affect both. This rule is not confined to cases where a conspiracy is charged, but it is applicable wherever a combination to effect a particular object is established. It rests on the principle that each is agent for the other in all matters relating to the common object, and the acts and declarations of one in furtherance of such object are admissible to affect the principal as well as the agent." *Commonwealth* v. *Tivnon,* 8 Gray 375, 381. *Commonwealth* v. *Dahlstrom,* 345 Mass. 130, 132–134. *Commonwealth* v. *Chapman,* 345 Mass. 251, 255. See *Commonwealth* v. *Galvin,* 310 Mass. 733, 746.

11. (Foster and Valleca). The charges against the defendants included that of armed robbery while masked. General Laws c. 265, § 17, as appearing in St. 1952, c. 406, § 1, prescribes increased punishment for armed robbery for "any person who commits . . . [such offence] while masked or disguised or while having his features artificially distorted." On this aspect of the case the

judge instructed the jury as follows: "As for the element of being masked, this is a term in common usage, and at least has no peculiar technical meaning in law in relation to the offense here charged. So far as I can refer you to elements of the common meaning of the term I note that its essence appears to be that by a covering or partial covering of a person's face the face is screened or concealed from view. The face need not be wholly screened or concealed. It is enough if its true character is screened or concealed . . . [to] such an extent that recognition of it is materially and substantially obstructed. The recognition need not be wholly obstructed."

Foster and Valleca argue that the instruction was incorrect. They argue that the statute should be construed to require proof that the face is so fully and totally masked as to prevent identification or recognition of the person wearing the mask. They then argue that since some victims of the robbery recognized Gatzimas and Flynn despite their stocking masks, the evidence was not sufficient to permit a finding that they committed a robbery "while masked." We do not agree. The statute does not require that a mask be such that it so totally covers or conceals the facial features that the wearer cannot be identified or recognized. The statute applies equally to the inept or bungling masquerader as it does to the skilful one. Perhaps the latter may avoid being recognized, but the former may not avoid criminal responsibility as a masked robber by reason of his less effective masquerade. The instruction to the jury on this phase of the case was correct.

12. (Foster and Valleca). Foster and Valleca contend that it was error for the judge to deny their motions for directed verdicts of not guilty. The summary of the evidence in the early part of this decision is sufficient for our decision of this issue, and we do not repeat it. There was no error.

a. Foster's argument appears to be that as to him the evidence shows no more than his association with the robbers, and perhaps his knowledge that a crime was to be

or had been committed, but not that he had any part in it. That may be an optimistic reading of the evidence in its aspect most favorable to Foster, but that is not the required test. The evidence must be read in its aspect most favorable to the Commonwealth. As thus read it was sufficient to permit findings that Foster was an active participant in the preparations for, the perpetration of, and the escape from the scene of the robbery, and that he received a portion of the money obtained in the robbery. On such evidence he is as much guilty as the two robbers who actually entered the Syrian club. *Commonwealth v. Knapp,* 9 Pick. 496, 517. *Commonwealth v. Devereaux,* 256 Mass. 387, 395. *Commonwealth v. Conroy,* 333 Mass. 751, 754. *Commonwealth* v. *Connolly,* 356 Mass. 617, 629, and cases cited, cert. den. sub nom. *Connolly* v. *Massachusetts,* 400 U. S. 843. *Commonwealth v. French,* 357 Mass. 356, 391, judgment vacated as to death penalty sub. nom. *Limone* v. *Massachusetts,* 408 U.S. 936.

b. Valleca's argument on his motion for a directed verdict entirely ignores, or neglects to cite or discuss, G. L. c. 274, § 2, which, as appearing in St. 1968, c. 206, § 1, provides: "Whoever aids in the commission of a felony, or is an accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed, shall be indicted, tried and punished as a principal." No further recital or discussion of the evidence is necessary to demonstrate that it was sufficient to permit the submission of the case against Valleca on the theory that he was an accessory before the fact, and that if the jury so found, he could be found guilty as a principal under the statute. See *Commonwealth* v. *Perry,* 357 Mass. 149, 151; *Commonwealth* v. *Benjamin,* 358 Mass. 672, 679–680.

13. To the extent that the defendants' briefs can be construed as including arguments on any alleged errors not specifically disposed of above, we have considered them and hold that they disclose no error. However, we think it necessary to note that the manner in which the briefs were written leaves much doubt on precisely which

exceptions or alleged errors were argued. This is due in large part to the defendants' attempted double incorporation by reference: first, by incorporating the numbers of multiple exceptions in each assignment of error; and then by incorporating the numbers of multiple assignments of error in the various headings of their briefs. The arguments which followed these headings were not usually directed at specific exceptions or assignments of error. Listing the number of an assigned error in the subheading of a brief avails the defendant nothing if that alleged error is not then argued. Assignments of error not argued in briefs are deemed to have been waived, and they are no less waived by merely incorporating their numerical designations in a brief without further argument thereon. S. J. C. Rule 1:13, 351 Mass. 738.

*Judgments affirmed.*